IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

COLLEEN BAGLEY, et al.,          )
                                 )
          Plaintiffs,            )
                                 )
v.                               )          Case No. 05-cv-3156
                                 )
ROD BLAGOJEVICH, et al.,         )
                                 )
          Defendants.            )

## OPINION

RICHARD MILLS, U.S. District Judge:

This case began over four years ago, when more than 50 Plaintiffs brought suit against state and union officials in two separate actions that are now consolidated.  The Plaintiffs, former Illinois Department of Corrections (IDOC) Captains, allege infringement of their First Amendment rights, in violation of 42 U.S.C. § 1983.

Specifically, the Plaintiffs allege that officials of the American Federation of State, County, and Municipal Employees (AFSCME) made large campaign contributions to former Governor Rod Blagojevich in exchange for State action to punish the Captains for attempting to

organize with a rival labor organization—the Illinois State Employee Association (ISEA).  The Plaintiffs allege that the elimination of the Captain Position and subsequent loss of seniority was orchestrated by AFSCME in order to hurt the Plaintiffs.

Over the years, the Plaintiffs have fruitlessly sought to find evidence of a corrupt conspiracy between AFSCME and officials in the administration of former Governor Blagojevich.

After exhaustive discovery, countless delays, and great expense, the Plaintiffs are no closer to their objective than when they began.

The fishing expedition ends today.

Summary judgment for the Defendants.

## I. BACKGROUND

### A. Parties

The Plaintiffs were employed as IDOC Captains prior to August 1, 2003.  On August 1, 2003 the Captain Position was eliminated.

Rod Blagojevich became Governor of the State of Illinois in January

2003.[1]  Julie Curry was the Deputy Chief of Staff to Governor Blagojevich, and was responsible for about fifteen State agencies, including IDOC.

Roger E. Walker  became the director of IDOC in June of 2003. James Underwood was the Personnel Director of IDOC and Justin Smock was the Assistant Chief of Labor Relations.  Curry, Smock, Underwood, and Walker are referred to collectively as the State Officials.

AFSCME's Council 31 represents over 30,000 employees of the State of Illinois.  Henry Bayer is the Executive Director of AFSCME Council 31, and Buddy Maupin is a Regional Director of AFSCME Council 31.  Maupin is also AFSCME Council 31's liason to IDOC, and AFSCME represents approximately 10,000 IDOC employees.  Maupin and Bayer are collectively called the AFSCME Officials.

## B. Organizing the Captains

ISEA was affiliated with the Laborers' International Union of North America and, like AFSCME, made significant campaign contributions to

---

[1] Former Governor Blagojevich is no longer a party to this case.

Blagojevich's 2002 campaign.  In 2002, ISEA made the decision to begin in earnest the campaign to organize the Captains.  It appears that card signing was occurring in late 2002 and early 2003, and that papers were filed with the State of Illinois to represent the Captains in early 2003.[2]

## C. Elimination of the Captain Position

During his gubernatorial campaign Blagojevich promised to eliminate layers of management in state government to save money and increase efficiency.

In early 2003, it appeared that the State of Illinois would run out of funds before the end of the fiscal year.  After receiving orders from Governor Blagojevich, Curry directed IDOC and other state agencies to streamline organizational structures.

The decision to eliminate the Captain Position was made before March 2003.  In March 2003, the governor's office prepared a proposed budget, effective July 1, 2003, that did not fund the Captain Position.[3]

---

[2] There is some dispute about exactly when the actual organizing began. However, that information is not necessary for the determination of the summary judgment motions.

[3] The elimination date was later pushed back to August 1, 2003.

On April 17, 2003, Curry met with the AFSCME Officials and informed them that the State would eliminate the Captain Position. Prior to the April 17 meeting, the AFSCME Officials did not have any conversations or any other communications with Curry or any other State Official regarding the elimination of the Captain Position.

The AFSCME Officials never had any conversations with former Governor Blagojevich regarding the elimination of the Captain Position. The AFSCME Officials did not participate in or have any involvement in the decision to eliminate the Captain Position. Furthermore, the AFSCME Officials did not request or encourage the Governor or the State Officials to eliminate the Captain Position. Governor Blagojevich eliminated the Captain Position through a line item veto.

### D. Seniority

IDOC planned to promote a limited number of the eliminated Captains, while offering the rest either layoff or demotion to lower ranks, primarily to Lieutenant or Correction Officer. The State Officials believed that the State would save money by moving former Captains to

vacant Lieutenant and Correction Officer positions, because the demoted Captains were already fully trained for the lower-level positions.

After the April 17 meeting, IDOC informed AFSCME that some former Captains would be demoted to Lieutenant. This decision could have adversely affected AFSCME members who were striving to be promoted to Lieutenant. AFSCME launched a campaign to persuade the Governor and the State Officials that the Captains should not be offered lower jobs within the bargaining unit.

AFSCME filed a grievance on May 28, 2003, complaining of the filling of the Lieutenant Positions with former Captains. The Governor and the State Officials did not accept the AFSCME position and the matter eventually went to arbitration, where the Blagojevich Administration prevailed over AFSCME in September 2003.

In July 2003, IDOC informed AFSCME that Captains who accepted demotion to Correction Officer would be given credit for past service in the collective bargaining unit before their earlier promotions. At a labor management meeting on July 16, 2003, Bayer stated that the

intent of the contract language was clear that Captains should not get seniority credit for past service in the R-6 bargaining unit.[4]

The master contract provided:

> Seniority for RC-6 and 9 shall, for the purposes stated in this Agreement, consist of the length of service of an employee with their department in an AFSCME bargaining unit(s), except when a previously excluded position enters a bargaining unit pursuant to labor board procedures, seniority for an employee in that position shall consist of the employee's total length of service with their department.

AFSCME interpreted "length of service" as "continuous length of service," while the State interpreted it to include noncontinuous periods of service within the bargaining unit.

AFSCME filed a grievance regarding the State's decision to award seniority to demoted Captains. The grievance was handled by the Department of Central Management Services (CMS), because all available recourse with IDOC had already been exhausted. CMS decided in November 2003 that the State's position was not viable, and the grievance was resolved by denying the former Captains any credit for

---

[4] Under AFSCME's master contract with the State, seniority affects bidding rights with respect to shifts, days off, promotions, and transfers and also determines the order of any future layoffs. If the demoted Captains were given seniority rights, AFSCME members would have lost their selected shifts and days off, because they would have less seniority than the recently demoted Captains.

previous service within the bargaining unit.

### E. Procedural Background

Two groups of former Captains then filed suit against the Defendants in 2005. The two actions have since been consolidated into the current case before the Court.

In October 2008, the Court granted a protective order to then-Governor Blagojevich, prohibiting the Plaintiffs from deposing him [d/e 135]. The Court found that Blagojevich enjoyed legislative immunity because the Captain Position was eliminated through a line-item veto. The Court blocked the Plaintiffs from deposing Blagojevich about the seniority issue because they had proffered no evidence that he was involved in that decision.

In the same order, the Court granted a protective order to Julie Curry, limiting the scope of her deposition. The Plaintiffs were blocked from seeking discovery on four areas of Curry's work with Governor Blagojevich on legislative matters.[5]

_____

[5] The prohibited areas were:
"(a) Curry's communications with Governor Blagojevich or anyone else in the

On February 20, 2009, the Court granted former Governor

Blagojevich summary judgment on both claims–the elimination of the

Captain Position and the denial of seniority [d/e 141].  The Court

granted summary judgment on the elimination of the Captain Position

because of legislative immunity, and Blagojevich prevailed on the

seniority claim because the Plaintiffs could not provide any evidence

linking him to that decision.

## II. STANDARDS

"Summary judgment is appropriate when the evidence submitted,

viewed in the light most favorable to the non-moving party, shows 'no

genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law.'"  *Smith v. Hope School*, 560 F.3d 694,

699 (7th Cir. 2009) (*quoting* Fed. R. Civ. P. 56(c) and *citing Celotex*

---

Governor's Office regarding IDOC's budget proposals;
   (b) Curry's communications with Governor Blagojevich or anyone else in the
Governor's office regarding the legislation intended to amend the State Budget to
fund the captain position, and the Governor's response to the legislation;
   (c) Curry's analysis of the budgetary effects of the elimination of the captain
position; and
   (d) Curry's communications relating to any other legislation where she, on behalf
of the Governor, had an active role." Order of October 22, 2008 [d/e 135].

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

In order to survive summary judgment, there must be sufficient evidence that a reasonable jury could find for the nonmoving party. *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

"A motion for summary judgment requires the responding party to come forward with the evidence that it has–it is the 'put up or shut up' moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009) (citations and internal quotation marks omitted). Although inferences are drawn in favor of the nonmoving party, inferences relying on speculation or conjecture are insufficient. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

The Plaintiffs have argued that a more lenient standard applies to them with regard to producing evidence to survive summary judgment. In addition, the Plaintiffs have cited a wide array of authorities to suggest that current standards for summary judgment are too rigid and exclude

too many cases.   The Plaintiffs' arguments on the summary judgment standards are without merit.

## III. ANALYSIS

### A. First Amendment Issues

The Defendants have not contested that the Plaintiffs' allegations, if true, constitute violations of the First Amendment.  Instead, they have largely argued that the Plaintiffs have no facts to substantiate the alleged conspiracy.  The Court assumes, without deciding, that if the Plaintiffs' allegations are true they are Constitutional violations.

### B. Pay-to-Play Politics

The Plaintiffs have alleged that they were harmed by a pay-to-play scheme in which AFSCME used the State Officials to punish the Plaintiffs for their efforts to organize with the Captains.

The basic notion of pay-to-play is that a person or entity must make payments to a politician or the politician's campaign in order to be able to receive government contracts or favorable policy decisions.  There are two basic variations of this quid pro quo mechanism: explicit and

implicit.

Both explicit and implicit pay-to-play are difficult to prove. Participants in explicit pay-to-play usually make every effort to conceal their conversations, in order to avoid prosecution on bribery and corruption charges. It is difficult to prove implicit pay-to-play because there is no agreement that is observable.

The Plaintiffs will not survive summary judgment by merely showing some evidence of pay-to-play politics. Instead, they must produce enough evidence that a reasonable jury could find that the two groups of Defendants conspired in an effort to punish the Plaintiffs for their speech.

The Plaintiffs do not receive any breaks because they are alleging facts that are difficult to establish. It is their case, and they have had ample time and opportunity to conduct discovery.

## C. AFSCME Officials

Defendants Maupin and Bayer have put forward three bases for relief: (1) they enjoy *Atkinson* immunity, (2) they are immune under the

*Noerr-Pennington* Doctrine, and (3) they did not act under color of state law to deprive Plaintiffs of their First Amendment rights. The AFSCME Officials are not immune under either of the first two theories, but they do prevail on their third basis of relief.

### 1. *Atkinson* Immunity

The AFSCME Officials claim that their actions are immune under *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 247-49 (1962). The Supreme Court held in *Atkinson* that union officials may not be held personally liable for damages under Section 301 of the Labor Relations Management Act when the union is responsible for the violation of a collective bargaining agreement. *Id.* at 247-49. Some courts have since read *Atkinson* to bar suits against individual union officials for claims arising in the collective bargaining context.

The AFSCME Officials do not enjoy immunity under *Atkinson* for two reasons. First, the United States Court of Appeals for the Seventh Circuit has not adopted the broad interpretation of *Atkinson* that the AFSCME Officials have propounded. Second, the Plaintiffs' allegations

are broader than any possible *Atkinson* immunity.

The AFSCME Officials claim they are immune because their activities related to collective bargaining. However, the Plaintiffs have alleged that the AFSCME Officials colluded with the State Officials in a corrupt scheme to retaliate against the Plaintiffs.

Even if the AFSCME Officials' proposed rule of law was binding on the Court, *Atkinson* immunity would not block examination of the conspiracy claim. Therefore, the AFSCME Officials are not immune under *Atkinson*.

## 2. *Noerr-Pennington* Immunity

The AFSCME Officials claim that their interactions with the Blagojevich Administration and the Illinois General Assembly are immune under the *Noerr-Pennington* Doctrine. The *Noerr-Pennington* Doctrine derives from *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). The *Noerr-Pennington* Doctrine originally exempted entities from antitrust action for advocating

laws that would have anti-competitive effects.  It has since expanded to other areas of law, providing immunity to those who petition the government.

The AFSCME Officials rely upon *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999), to show that the Seventh Circuit has applied the *Noerr-Pennington* Doctrine to Section 1983 cases.  The AFSCME Officials claim that under *Tarpley* union leaders are immune in their efforts to persuade government officials.[6]

To the extent that the Plaintiffs allege that the AFSCME Officials engaged in traditional advocacy, *Tarpley* would provide immunity.  However, the Plaintiffs have alleged that the AFSME Officials and the State Officials were involved in a corrupt scheme.

The alleged conspiracy is more than the mere advocacy that took place in *Tarpley*, where there was no allegation of a quid pro quo or

---

[6] In *Tarpley*, a Republican Party official recommended that a state-operated hospital hire a Republican precinct worker.  188 F.3d at 790.  An unsuccessful employment candidate at the facility sued the party official under Section 1983, and the district court granted summary judgment to the party official.  *Id.* at 790-91.  The court stated that the advocacy was protected by the First Amendment.  *Id.* at 797.

bribery.  The First Amendment protections enshrined in the *Noerr-Pennington* Doctrine protect those petitioning the government, but do not provide immunity to individuals who are accused of bribing government officials.

Therefore, the AFSCME Officials do not enjoy blanket immunity under the *Noerr-Pennington* Doctrine because the Plaintiffs allege a corrupt conspiracy, not mere advocacy.

### 3. Lack of Evidence to Establish a Section 1983 Claim

The Plaintiffs assert that because of the alleged corrupt scheme, the AFSCME Officials engaged in state action.

The court in *Tarpley* explained that "the conduct of private parties can, under certain circumstances, constitute state action."  188 F.3d at 791.  The court explained there can be state action if there was a conspiracy between a private party and state actors in order to deprive the plaintiff of a constitutional right.  *Id.* at 791-92.

Determining whether conduct can be characterized as state action requires case-by-case analysis.  "Over time, Supreme Court and Seventh

Circuit precedent have revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 816 (2009) (citations omitted).

In this case, there is insufficient evidence of a conspiracy to link the AFSCME Officials to state action. A claim under Section 1983 fails without state action.

The Plaintiffs have contested few of the material facts advanced by the AFSCME Officials. The grievance over the contract language determining seniority is one of the few issues that the Plaintiffs have raised. The Plaintiffs claim that AFSCME's interpretation is unreasonable, and that AFSCME pursued the claim only to punish the former Captains.

The seniority issue presented a zero sum situation where either AFSCME members or the former captains were going to suffer a detriment. The AFSCME Officials' contend that they fought over the

language to protect the lower level AFSCME members.  The Plaintiffs argue that AFSCME's challenge had nothing to do with its members, but was rather a ploy to punish the Captains.  However, the Plaintiffs have no factual support for this contention.

Over one and a half years ago, the Plaintiffs noted that discovery in this case included the "(1) exchange of approximately 15,000 pages of initial disclosures; (2) responses to more than 135 interrogatories; (3) responses to more than 135 production requests; (4) subpoenas issued and documents received from various third-parties; and (5) nearly 70 depositions."  Mot. to Extend Disc. Deadline [d/e 126], at 1. Since that time, more discovery has occurred.

After all of this, the Plaintiffs are still unable to produce enough evidence that a reasonable jury could find that the AFSCME Officials colluded with the State Officials as part of a corrupt plan to make the former captains pay for their efforts to organize with ISEA.

Yet, the Plaintiffs still seek to go to trial.  Apparently, they wish to present to a jury what they have presented the Court: supposition and

innuendo.  Since the Plaintiffs are unable to produce any evidence of a

quid pro quo or a conspiracy, summary judgment for the AFSCME

Officials is appropriate.

### D. State Officials

#### 1. Elimination of the Captain Position

The Plaintiffs concede that the State Officials cannot be found

liable for the elimination of the Captain Position because of official

immunity.  In doing so, they have unsuccessfully attempted to tie the

Court's earlier decision regarding Blagojevich's immunity to all

Defendants.  The Plaintiffs state the following:

> The Plaintiffs acknowledge that if Governor Blagojevich's actions are
> entitled to legislative immunity, all of the other defendants are entitled
> to immunity as to this issue [elimination of the Captain Position].
> Given that the Court has already granted the motions by concluding
> that qualified immunity has been established, this issue has been
> previously disposed of.  As such, the only issue remaining for this Court
> to decide is whether there is sufficient evidence from which a jury could
> conclude that the defendants retaliated against the Plaintiffs by
> eliminating their seniority.

Pls.' Resp. To Mot. for Summ. J. [d/e 161], at 3 (footnotes omitted).

While the Court made determinations regarding the actions of

Blagojevich and Curry involving legislation, it has not made any

determination regarding potential official immunity of the other State Officials. The determination of official immunities requires an examination of the job duties and specific acts of the official who is claiming immunity.

The fact that a governor enjoys legislative immunity for making a line item veto in a budget bill does not necessarily mean that lower level executive branch officials enjoy the same immunity. In addition, the Plaintiffs' statement that <u>all</u> of the other Defendants are immune is broad enough to include the AFSCME Officials as well.

The Plaintiffs have attempted to put words into the mouth of the Court. The Court's determination regarding the immunities enjoyed by former Governor Blagojevich and Curry are each separate determinations, compartmentalized from the rest of the case and the rest of the Defendants. Immunity is not automatically imputed to other Defendants.

The Plaintiffs have thrown up their hands on the matter of the elimination of the Captain Position. They have not responded to the

State Officials contentions on this claim, and they have not made any alternative arguments. The Plaintiffs have made no effort to effectively argue their case. Instead, they point out an earlier disagreement they had with the Court that is not necessarily controlling on the issue.

Therefore, the State Officials obtain summary judgment on the issue of the elimination of the Captain Position, not only because of the conceded official immunity, but also because the Plaintiffs waived this issue by making no real argument on the claim.

## 2. Seniority of Former Captains

In order to survive summary judgment on the seniority claim, the Plaintiffs need to show that they have some evidence of a causal link between their organizing activities with ISEA and the elimination of their seniority. And that evidence needs to be such that a reasonable jury could find for the Plaintiffs on this issue.

The Plaintiffs have limited their seniority claims to former Captains who became entry level Corrections Officers.[7] The Plaintiffs have stated

---

[7] The Plaintiffs have not addressed former Captains who accepted layoff or demotion to other ranks. Therefore, the Plaintiffs' claims on those other grounds are

that this decision was in contravention of the language of the collective

bargaining agreement, and that the Governor's Office interfered with the

decision.

### a. Contract Interpretation

The Plaintiffs believe that the interpretation of the collective

bargaining agreement by CMS was so beyond reason that it is evidence of

a conspiracy between the AFSCME and State Officials. A lay jury cannot

be tasked with this determination. Contract interpretation is a question

of law, and is therefore outside the province of the jury.

As a matter of law, the Court finds that the CMS interpretation

was not objectively unreasonable. The AFSCME Officials contend that,

based on past application of the term, "length of service" has been

applied to mean "continuous length of service." AFSCME Officials' Mot.

for Summ. J., at 16 [d/e 143]. The Plaintiffs to do not contest that the

term has traditionally been interpreted as "continuous length of service."

Instead, they focus solely on the text. Pls.' Resp. To Mots. For Summ. J.,

---

waived, and therefore summary judgment is appropriate on those claims.

at 5 [d/e 161].

The parties interpret the contract differently because they are using competing mechanisms for interpretation. Unfortunately, methods of interpretation often directly contradict each other. *Cf.* Karl Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed*, 3 Vand. L. Rev. 395, 401-406 (1950). Considering that reasonable minds could differ about how the contract should be interpreted, the CMS determination was not objectively unreasonable.

### b. Curry's Alleged Involvement with CMS

The Plaintiffs acknowledge that Curry stated in an affidavit that CMS made the decision regarding contract interpretation. However, the Plaintiffs claim that there is a jury question because in her deposition Curry said she had spoken with the Nancy Pittman, Chief Legal Counsel for Labor Relations at CMS. Pittman was the CMS attorney who handled the case. The Plaintiffs argue that a reasonable jury could conclude that the State Officials influenced the CMS decision. The

Plaintiffs' argument is without merit.

The Plaintiffs' allege that Pittman had no reason to be in contact with Curry. However, Curry was the Deputy Chief of Staff of the Governor and had reason to be kept aware of the progress of a labor dispute at an agency she had stewardship over. Furthermore, there is no indication that Curry did anything untoward.

Curry's deposition actually refutes the arguments made by the Plaintiffs. In her deposition, Curry recalled having conversations with Pittman, and stated that these conversations included Pittman appraising Curry of the filing of the grievance or that Pittman had made a determination regarding the grievance.

Although Curry did not divulge all aspects of her conversations with Pittman,[8] she did make a number of unequivocal and broad statements which refute the Plaintiffs' allegations.

---

[8] Curry did not answer some questions about conversations with Pittman because Curry claimed attorney-client privilege. Plaintiffs' counsel did not agree with the claimed privilege, and reserved the right to bring up the issue with the Court. Dep. of Julie Curry, at 16-17 [d/e 163]. The Plaintiffs have not raised the issue with the Court after the deposition. Therefore, the Plaintiffs have abandoned their objection and the Court will assume that the conversations were indeed privileged.

Curry stated that the determination was made on the merits of the case, and that it was Pittman's decision. Curry further testified that she did not discuss the issue with the Governor, and that she could not recall discussing the determination with any officials from AFSCME.

The Plaintiffs have not responded in any way to the statements Curry made under oath. A full reading of the Curry deposition shows that there is no indication that Curry or another State Official had inappropriate contact or influence with CMS or Pittman.

## IV. CONCLUSION

Ergo, the AFSCME Officials' Motion for Summary Judgment [d/e 143] and the State Officials' Motion for Summary Judgment [d/e 144] are ALLOWED. Judgment shall be entered in favor of the Defendants and against the Plaintiffs.

IT IS SO ORDERED.

ENTER: January 15, 2010

FOR THE COURT:

s/Richard Mills
United States District Judge